Case number 242678, Old Jericho Enterprise, Inc. v. Visa MasterCard. Mr. Bateman, whenever you're ready. Thank you. Good morning. Christopher Bateman on behalf of the Old Jericho Plaintiffs. May it please the Court. I'd like to start by picking up with one thing that defense counsel just said, which we agree with, which is correct, that this Court's ruling in Fikes addressed an ascertainability problem between two sets of merchants. And one was branded gas retailers, and the other was gas brands. And the issue was that the branded gas retailers argued that they were the ones who accepted the card within the meaning of the settlement because they physically handled the card from the cardholder, while the gas brands were the ones who contracted with the acquired rank and provided processing services. Now, as counsel accurately said, there was no factual record presented at that point on the Fikes appeal, but that was the understanding that the Court had as to the arguments of the parties. And this Court in Fikes resolved that ascertainability issue, the question of which of these two merchants accepted the card within the meaning of the class definition by holding that it was the direct payer of the challenged fees. And that was consistent with what the settling parties said all along throughout the settlement approval process. And that's where something that defense counsel said just now is incorrect because she suggested that the parties understood that the merchants who take the card from the cardholder is what the parties intended. But that's not what the settling parties said about what they meant under the settlement. As Mr. Shamagen himself told this Court at the Fikes hearing, quote, the party that has accepted the card is the party that transacts with and pays the relevant fee to the acquiring bank or processor, unquote. And that's from page 1903 of the joint appendix. And class counsel said the exact same thing. They said that the direct payer was the only entity that they represented in the card processing chain. And they defined that as, quote, the first payer who is closest to the network, unquote, and who, quote, accepts the network's rules, unquote. And that's from page 1898 of the joint appendix. And in fact, class counsel specifically rejected the idea that the party that physically handles the card is who accepts the card within the meaning of the settlement. Physical card handling was, again, the test that the Fikes objectors, the brand of gas retailers, offered for why they were, in their view, the party that accepted the card. And here's what class counsel told this Court at the Fikes hearing about that argument. Quote, and what Fikes does is they point to the transaction where the customer presents the card to the gas station. That's not the transaction that's at issue here. That's not the product that's being sold here that is a subject of this price-fixing antitrust case. The product that's being sold is the processing services, and it's that merchant that accepted in the first instance. And that's from page 1898 of the joint appendix. So the settling parties were clear about who they intended to bind with this settlement. Who physically handles the card is not what matters. It's the direct— But why wouldn't a merchant want to purchase card handling services? If the merchant can't have any customers, the merchant would go out of business. So why not view the merchant as the entity that is purchasing the card handling services? It's the only entity that has any interest in the whole transaction. Well, the gas brand has just as much of an interest in the transaction, and they're the direct purchaser of the card acceptance services, and they just as much need those card acceptance services for that transaction to go through. And they're the direct payer, and they're the one that contracts with the acquiring bank. And that's who class counsel and defendants intended to bind with this settlement, and that's consistent with Illinois BRIC, as was discussed earlier. And it's consistent with who class counsel said they represented in the case and in the settlement, which was the direct payer of the challenge fees. And when you start to move away from that, as the district court here did, and say, you know, it's the least direct purchaser that is the class member, as the court effectively held, then you run into these adequacy of representation problems, because class counsel only purported to represent the direct payers. I mean, CHS, which was a gas brand, was one of their class representatives. So they were representing the direct payers, and they settled the case in a way that's consistent with that. They settled based in large part on a litigation risk that only applies to a direct purchaser's asserting federal law claims, which is this defendant's Illinois BRIC defense, that they weren't the direct purchasers, that the acquiring banks were the direct purchasers. So that was a major litigation risk that class counsel themselves cited in settling the case. And that risk doesn't apply whatsoever to indirect purchasers under state law. So that's one way in which the settlement is not in the interest of indirect payers. And there's another way, too, which is that the settlement was designed to work for direct payers. It was designed to work for the parties that had the contract with the acquiring bank. It depends on data from the acquiring banks to link the transactions with the class member. So because of that, they basically don't have that data for the brand of gas retailers. The brand of gas retailers have a process that's essentially stacked against them, where they then have to prove their card volume through other means. And that's not an easy thing to do. And I think realistically a lot of smaller brand of gas retailers are not going to be able to navigate that process and that claims dispute process and show what they're entitled to under the district court's ruling. Can I ask, why did the Old Jericho plaintiffs not opt out of the settlement agreement? Well, we did not opt out because, first of all, there were objections made by brand of gas retailers about who accepted the card, about this ambiguity with the class definition. And the answer that the settling parties came back with was that it was the direct payer of the fees. And so our position all along has been that we're indirect payers of the fees. So when we heard that, we're not bound by the settlement. We're free to bring our own antitrust case, and that's what we did. Presumably you had the indirect purchaser claims in the repealer states all along. Correct. But we did bring the case after the court's final approval order. That was the point at which it was confirmed that the settlement was limited to the direct payer that resolved that kind of ambiguity. And then this court upheld that later in fights. Yeah. The district court took the position that under Illinois BRIC there can be only one entity that's eligible to receive damages for a transaction and claimed to derive that message from the Illinois BRIC opinion where I don't see that the district court said anything of the kind. And in the opinion that I filed separately the last time you were before us, I imposed a hypothetical where two farmers get together informally and they chip in 50-50 to buy a piece of very expensive equipment that neither of them would be able to afford, and they agreed that we'll use it 50-50, we'll pony up 50-50 for the maintenance and repair expenses and so forth, and use it equally and so forth. And then when there's a suit, they bring a suit or they're part of a class, the question is faced, who is eligible to receive the benefits, to receive the judgment of an antitrust judgment against the seller of the equipment? What's your answer? Who's eligible, who's eligible, who's ineligible between Farmer A and Farmer B and why? So we agreed, Judge LaValle, that you could in theory have joint direct purchasers if that's what the contracts showed, if they established that kind of relationship. So you say the district court, you do not agree with the district court's proposition that which was driving, which as I understand it was driving this in substantial measure, that there can only be one. Well, I think it's in theory possible, but it's not what the contracts reflect here. And I think that the parties… So you agree that in my hypothetical there are cases that are enough like it, which would be rare, no doubt, no question about that, that there is no rule under Illinois BRIC that says it can only be one. If two or more parties are really acting jointly in making the purchase and it's not a matter of successive purchases, which is what the Supreme Court faced in Illinois BRIC, that there's no reason why two or more can't share. It can be only a single judgment. Judgment can't be any larger than it would be if there were only one, but two can share. We agree with that in theory, as a theoretical matter. But what happened here is that the parties essentially assumed that there was only one direct purchaser as between a gas brand and gas retailer. And this court adopted that assumption for purposes of the ruling, of the court's ruling. But that assumption turned out to be correct as the contracts reflect that are in the record here. The gas brands are the sole direct purchasers here. They're the only ones who contract with the acquiring bank. They're the ones that directly pay the fees to the acquiring bank, and then they resell those services. My problem is that the district court was driven by and shaped – the district court decision was shaped by an assumption that you say you agree was false. The assumption that there can only be one. And if there can be more than one, the district court never didn't consider the question whether the oil companies and the service stations should be deemed to be pretty much the equivalent of the two farmers who get together for the purchase of this piece of machinery. So the district court's ruling here, which you are contesting, didn't consider that they could be joint, that the oil company and the service station could be joint participants in one award. You're arguing that the district court made a different error, that the district court made the error of identifying the wrong one as the only one who could be eligible. But that's a different error from the error that I see in the district court's opinion if at least it's possible to argue that both are eligible to share the award. What about that? So, again, that was an assumption that was being made, that there was only one direct payer and only one direct purchaser. But we are in the world here where that assumption is true. That's what the contracts reflect here that are in the record. So I think the Fikes court was addressing that – was working on that assumption, right, that there could be only one direct purchaser and to say we're not going to say whether that's true or not as a matter of law. And Your Honor pointed out that that's not necessarily true as a matter of law. What did it do with the fact that the district court was looking at it as the law? Well, what this court in Fikes was doing was essentially running with that assumption and saying, okay, if we take that assumption to be true, then it's the direct payer that is the class member, that is the party that accepted the card. And there were good reasons for that holding. Now, if that assumption turns out not to be true for some contractual arrangement out there, I think we're in a different world. But the world we're in here is that the contracts do bear out that assumption here. That's what the contracts in our record show. How does the contract show that there was a contractual assumption that only one entity could be an eligible antitrust plaintiff? Well, what the contracts show is that the gas brands were the sole direct purchaser. They show that the gas brand is the one that contracts with the acquiring bank, and it's the one that directly pays the fees to the acquiring bank. And that's what's relevant to the direct purchaser analysis under Illinois BRIC, under Applebee Pepper. And then the contracts further show that they resell those services to the branded gas retailers, like the Oljerico plaintiffs, who don't contract with an acquiring bank with respect to their branded gas card transactions. And that's true for several of the Oljerico plaintiffs that are exclusively indirect purchasers. So they don't contract with the acquiring bank, and they don't pay the fees directly to the acquiring bank. How do the gas brands suffer antitrust injury? The gas brands can suffer antitrust injury here, even if they pass on all the damages, because of reduced output, for example, on card transactions, gas sales using credit cards. Reduced output? Correct. I mean, because of the increased fees, you could essentially have, you know, some consumers not using – not buying as much gas because the price is more expensive. That's one of the recognized antitrust harms that a direct purchaser can have that then still passes on, you know, the fees to somebody else. So it's a lot of sales, essentially. The branded oil company is getting exactly the same money for the gas that it's selling to the retailers, correct? Well, the gas brand only gets as much revenue as is sold in the form of the gas, right? So the more gas is sold, then the gas brand is going to make more money. So if there's reduced output as a result of these higher credit card fees, that could cause lost sales. I think it's a recognized harm that direct purchasers can have. But the consumer that buys the gas, the consumer buys – you know, is happier to use a credit card because you get free credit. So I think – I'm not understanding how you suffer – your clients suffer antitrust injury from the fees charged in the credit card transactions. Well, to be clear, our clients are the branded gas retailers. So the old JR complaints are the branded gas retailers, not the gas brands. And, you know, I mean I was going – I was trying to answer the question directly. But the other aspect here is that under Illinois BRIC, it's just not legally relevant, right? What the gas brand, the direct purchaser, what – even if they pass on all of the overcharge, they still have the claim under Illinois BRIC. This is black-letter law. No, I answer – you're representing gas retailers. Correct. But you want out-of-class, right? Right. So you're arguing that the entities that are suffering antitrust injury is the oil companies. I was just saying that that is a form of injury that they could have. It's just a form of – it's lost sales essentially because of the higher credit card fees. Even though they're passing on all of those overcharges to the branded gas retailer, and that's how the branded gas retailers I think are primarily harmed is from paying those pass-on overcharges. Thank you, counsel. You have reserved some time for rebuttal. Thank you. Mr. Shanmugam. Thank you, Judge Park. Hannon Shanmugam of Paul Weiss on behalf of Applebee's Visa and MasterCard. So in my limited time today, I'd like to do four things. First, I'd like to start by talking about what this court actually held in Fikes. Second, I'd like to explain why appellant's position across these two cases with regard to what this court did in Fikes isn't correct. Third, I'd like to talk a little bit about what Judge Brody actually did on remand here. And fourth, I'll address the question of our prior position on these issues. So let me start with what this court actually said in Fikes. In its opinion in Fikes, the court made clear that either the branded retailers or the fuel suppliers could be, quote, deemed to be direct payers of the challenged fees. And this court left that question to the district court because the answer to that question, quote, must wait for a developed factual record. Now, let's start with the court's opinion in Fikes. All of this came up in the context of an argument concerning ascertainability. And this court was rejecting an argument that because it would not be feasible to identify who the class member would be, the class was not ascertainable. The court, at page 716 of its opinion, was very careful in what it said. Characteristically careful, I would add. And it said the word accepted lends itself to ambiguity. But the district court properly concluded that the class definition is objectively guided by federal antitrust standards. If you go back and look at Judge Brody's earlier opinion, which is cited there because that's quoting the district court's opinion, what Judge Brody was saying is that as a matter of federal antitrust law, there can only be one party that can recover. In other words, it couldn't be both the branded retailers and the fuel producers in this situation. And I want to bracket Judge LaValle's very learned concurrence on the question of whether or not you might have a two-farmer type situation. I will come back and address that just to make clear that that's not the theory on which the appellants relied and to explain how that's consistent with what Judge Brody did. But in any event, the court went on to say that federal antitrust law clarified that only entities that could fall within the class definition. Judge Brody also went back, though, to sort of a common-sense understanding of acceptance of a card sort of based on a prototypical transaction. What would you have to say about that, about what we said in Fikes? Well, I'm happy to jump directly to what Judge Brody did here, because if you look at her opinion, I think she started by really faithfully repeating what this court said. She recognized the potential ambiguity in the term accepted. She recognized that the analysis should be guided by federal antitrust standards. And then she turned to extrinsic evidence and a variety of sources to make the determination that, in this case, it was the branded retailers who accepted the cards. So it was no longer ambiguous? Well, I think she resolved the ambiguity in the relevant sense. She resolved the ambiguity by saying, interpreting the term accepted, and I think she did rely on common sense and plain meaning, but she relied, as the court will be aware, on a variety of sources that the branded retailers qualified. In particular, she focused, as this court asked her to do, on the agreements between the branded retailers and the fuel suppliers. And those agreements— And we said to determine who is the more direct payer, which was altogether disregarded. I don't think so, Judge Park. And again, this court, I think, was careful in saying that the question was who is deemed to be the direct payer of the challenged fees. And I want to underscore our fundamental submission, which is that to the extent that the argument on the other side is that the word accepted is coterminous with the party that is in the most direct contractual relationship with the defendants for purposes of federal antitrust law, that that is not the test that this court adopted. And, you know, I sort of start from the proposition that if that is what the court wanted to do, it could readily have said that and could readily have gone on to determine who that party would be. But instead, the court made clear that the question was whether or not a party was deemed to be the direct payer. Now, why did the court use that language? I would submit that it is precisely for the reason that Ms. Zaney said in the earlier argument. Remember that the consistent position of the defendants, and there is no ambiguity whatsoever about this, is that for purposes of federal antitrust law, for purposes of the Illinois BRIC analysis, it is neither the branded retailers or the fuel producers or the fuel suppliers who is the direct purchaser. It is instead the acquiring bank. As Ms. Zaney said, and I really can't say it any better, so I'll just restate it, that was the issue that we agreed essentially to give up as part of the settlement. So this was a case where, from our perspective, we were settling with people who were indirect purchasers for purposes of federal law and who would therefore eventually lose on their claims. It's no accident that the language of the settlement agreement itself was not framed in terms of the Illinois BRIC standard. It was simply framed in terms of who accepted the cards. And so that is why I think this court was quite careful to say this is a matter for the district court to determine analyzing the underlying contracts. Now, what do those contracts make clear? I think there's no dispute that when it comes to the issue of who bears the burden of these allegedly super competitive fees, it's the branded retailers. There's no suggestion here that as a factual matter, the fuel suppliers are on the hook for some portion of the alleged overcharge. And that's why Judge LaValle, assuming that your analysis in the concurring opinion was exactly right as a matter of federal antitrust law, this is just not a two-farmer case. This is not a case, and we discussed this at the last oral argument in this court, this is not a case where, for instance, the branded retailers bore $0.60 on the dollar and the fuel suppliers bore $0.50 on the dollar. Again, there's no factual dispute that the branded retailers bore the incidence of that overcharge. And in this case, the fuel producers were essentially providing processing services. This is a little bit of a different case from the last case in that in the last case, I think it can fairly be said that the squares of the world are operating as agents. The relationship here is a little more complicated because after all- Let me interrupt for a second. I mean, you say it's not a two-farmer case, and it clearly is not a two-farmer case, but that doesn't necessarily mean that the same considerations might not apply. Because first of all, to look at Illinois Brick, what Illinois Brick was looking at was a very characteristic sort of a transaction, one that happens all the time in the majority of- great majority of these cases, where you have a succession of transactions. You have a first purchaser who then processes in some way the thing that has been purchased, then sells it to somebody else who processes it further in some way, and it goes on down the line in a series of purchases until it reaches some consumer. And the Supreme Court said, we don't care about all those later ones. The only one who can claim is the first one, and the ones who are down the ladder at a separate second, third, and fourth. That's not what we have here at all. Here we have a single purchase, a single purchase from the master Visa card, of the right to use, to employ Visa MasterCard payment services in a selling situation. That right does not get passed on from one to another to another to another. So it is at least arguable, I'm not sure what the resolution should be, but it seems to me at least arguable that what you have in the gas station integrated oil company situation is you have two entities who join together for a particular – for the business of selling gas to people who drive up in their cars and want to fill their tank. We will buy credit card services from Visa MasterCard and therefore use it, and it will be to both of our benefits. And whether this is economically like the two farmers, it's certainly different in some ways. Now, my problem is that the district court was operating under the assumption that, no, you can't have more than one. What Illinois BRIC said was you can only have one. But Illinois BRIC didn't say that, and I don't think Illinois BRIC meant that. I don't think Illinois BRIC was talking at all about any situation other than the situation where you have a succession of sales down the line, where it was making a very clear bright line rule. So now here I'm not quite sure what the – how the situation should be answered, but it seems to me that a potential answer is to say that for their mutual convenience, the service stations and the integrated oil company could have done it either way. They could have said, okay, you'll be the one who applies or we'll be the one who applies. An entity acting on behalf of all the service stations in a manner more or less equivalent to Square, the Square situation, could have said, okay, we will act for – you will act for all the service stations and do the complicated accounting and all that with Visa and MasterCard, or it can be the oil company that does it. It doesn't matter. It can be either one, and it's just a matter of our mutual convenience to do it one way or the other. So why is that a situation where a court should be governed by the notion there can only be one? And if the court was making an error in that, I'm not sure it matters here because it seems to me the error that the court was making was not the error that your adversaries are saying. The adversaries are saying it shouldn't have been us. It should have been them, and it seems to me that a better argument would be, well, it could have been that they were eligible, the oil companies were eligible. It could have been both or it could have been just one, but there's no rule that says it has to be just one. So I'm sorry. It's a very long question. Well, and forgive me if I give a very long answer, but I want to address a few aspects of that, and I want to make clear at the outset that we're not fighting the reasoning of your concurring opinion in the slightest here. So first of all, our position here is that this is appropriately conceived as a series of transactions or steps. There are contractual relationships at every stage along the line. So while all of this takes place very quickly when you present your card at a service station or somewhere else, there are still relevant contractual relationships that govern this, and on the merits of federal antitrust law, we would say that this is a pass-through type situation that implicates the Illinois BRIC rule, and I would note parenthetically that that is an issue that we are continuing to litigate in the opt-out cases, one of which, for instance, is brought by one of the fuel producers, and that litigation is still ongoing. That is our substantive position as a matter of federal antitrust law. But I think my second point and perhaps the more germane point for purposes of today, Judge LaValle, is that nothing that the district court did in the order under review is inconsistent with that. Now, I do think that it is true that in the earlier stages of all of this, including the district court opinion, that this court quoted in the relevant portion of the Fikes opinion, the district court was relying on what I would label the AGC proposition. In other words, that there cannot be double recovery. You can't have a situation in which, you know, both parties recover 100 cents on the dollar. And so in a situation, it's either got to be 60-40, or it's got to be a situation where you're trying to determine who gets the 100 cents. And the whole theory, when this went back on remand, was this is the latter category. This is a case where it's an either or proposition. Now, what did the district court do in the order under review? Judge Brody carefully canvassed relevant contracts. She started with a proposition that when you look at the contracts on their face, the contracts make quite clear that the branded retailers were the ones that accepted payment cards. That phrase appears in many of the contracts. But then when you look at the underlying contracts themselves, and this goes, I think, to some of the points that Judge Jacobs was making earlier this morning, who bore the responsibilities of card acceptance, including abiding by the rules for merchants? It was the branded retailers. Who bore the risks of card acceptance? You know, liability for responsibility for chargebacks, indemnifying fuel suppliers for any losses from transactions that go bad. Again, the branded retailers. Who had the right to the receivables from the transactions? Again, the branded retailers. And I also want to reiterate one point that came up in fights, which is that most of the branded retailers, it is undisputed, accepted payment cards for separate transactions that didn't have any involvement of the fuel suppliers. And that in and of itself, in our view, was sufficient to bring them within the ambit of the definition of the class. Our fundamental submission today is that recognizing that there may be some ambiguity with the term, except in the abstract, the theory that's being advanced by the appellants today is decidedly inconsistent with this court's decision in fights. Mr. Bateman said that the test is whether or not a party- Well, can I ask about, I think you were going to get to your prior position, but I do have a concern that it feels like you're trying to have your cake and eat it, too. I think that there were some arguments that you raised that sounded much like your adversaries today for purposes of getting the class confirmed, but now it seems like you're trying to rope in every plaintiff you can within direct claims. I don't know if this goes to estoppel or waiver or what, but I would like you to address that. I'm happy to go directly to that, because this was an issue that we were obviously thinking about at the time of the earlier appeal, not least because among the objectors were branded retailers who made the argument that they were, in fact, in the class. And if you go back and look at our brief, and then I'll turn to the statements that were made in oral argument, in our brief at page 30 we said, quote, only one entity in a payment chain accepted a payment card for a given transaction and is thus a class member based on the transaction under the settlement. And then at page 34, when there is a dispute between multiple plaintiffs, the special master, dot, dot, dot, will consult the underlying contracts and any other relevant source to determine which entity owns the claim for a given transaction. Now, let's turn to the oral argument in that case, and certainly when I reread transcripts of my own oral arguments, I'm sometimes embarrassed by my lack of precision. This is not one of those cases. If you look at the statement that my friend Mr. Bateman quoted at page 1903 of the Joint Appendix, what I said was the party that has accepted the card is the party that transacts with and pays the relevant fee to the acquiring bank or processor. And note that I think the correct way to understand what's going on here is that the fuel producers are providing processing services to the branded retailers. And I went on at some length to talk about the fact that class counsel had said that that is the party that is rightly thought of as the purchaser here because it's the party that purchases network services. It accepts the terms required in order to access the visa. I guess I'm not so concerned about, you know, specific statements that you made then and, you know, in briefs today. It's more the analysis that we adopted in FIACS was largely yours, the direct purchaser looking primarily to the direct payer, and now it seems like you're singing a different tune. I want to be clear that I don't think that that is true. I think that we were first agnostic as to what the correct answer would be on this issue, and I would point to what I said in 1906. I said if, say, a brand operator ultimately turns out not to be able to prevail here, that brand operator is not going to be within the class. We took the position that what this court should do, as I indicated earlier, was to look at the underlying contracts and figure out the correct answer here. We were simply making the point that if it turns out, for instance, that the old Jericho parties, and we took the position that they were indirect purchasers, but that was, of course, consistent with our broader position, would be outside the class, then they could proceed, but that that was an issue for the district court to determine on remand. And again, our position all along has been that none of these parties are direct purchasers. I think that the reason why we and this court have spoken in terms of direct payers is sort of precisely to avoid conflating this with the Illinois brick analysis, and I think that that's why this court was careful, again, to say the party that is deemed to be the direct payer here. And so the district court did, I think, exactly what this court asked it to do. The district court carefully reviewed all of these underlying agreements and came to the conclusion that, in fact, it is the branded retailers. And as a matter of common sense, I do think that there is a lot to be said for the proposition, that the branded retailers were the parties here that accepted the cards and suffered the harm from the allegedly super competitive fees. And certainly, as was clear in the cow play between Judge Jacobs and my friend, Mr. Bateman, this is a situation in which his clients are the ones that, in his view, suffered the injury because they paid the allegedly super competitive fees. There's no suggestion here that the fuel producers bore that cost, even though Mr. Bateman hypothesized other types of injuries that they might be able to claim. There's no suggestion that they were out of pocket for many particular transactions. I would note parenthetically that the same is true with regard to the payment facilitators in the first appeal. And when a party reaches a settlement, there's no reason that the settlement, by its terms, has to reach only those parties that would have prevailed if the claim goes forward. And this is not a case in which the settlement is sweeping in parties that lack Article III standing. This is simply a case in which the settlement may sweep in people who, in fact, turn out to be indirect purchasers as a matter of federal antitrust law. There's nothing wrong with that. And again, there's nothing in this court's earlier opinion and facts that adopts a standard that requires the parties that accepted cards to be coterminous with the parties that would have the most direct contractual relationship for purposes of Illinois BRIC. Again, if that is what the court had wanted to do, the court would have said that. The language that the court used is, in fact, inconsistent with that sort of standard, and it's not surprising that Judge Brody construed this court's opinion in that fashion. Thank you, Counsel K. We'd ask that the district court's judgment be affirmed. Thank you. We'll hear rebuttal. So I think what Mr. Chamigan was saying there is what the defendants have tried to do in their briefs in defending the district court's ruling, which is to just erase the direct payer holding from this court's facts opinion. But the direct payer holding was the way that this court resolved the ambiguity as to who accepted the card. So in their account, this court essentially just gave a circular answer to the question of who accepted the card and came back and said, you know, the party that accepted the card is the party that accepted the card, and we're going to send it back. Go look at the contracts with no guidance as to what to look for. That's all we're going to tell you. But that's not what this court did. The court said that it's the direct payer of the challenged fees who accepted the card, and that was consistent with what the parties had said to the courts, the settling parties, and that was also consistent with Illinois BRIC, as this court pointed out. So this court had good reasons for that holding. So, you know, the district court, when it embarked on its own interpretation of the contracts to try to figure out who accepted the card, essentially just discarded that direct payer rule and went and looked at, you know, various other things that, you know, really just ignored both this court's holding and fights, that it's the direct payer of the challenged fees, and ignored the settling party's statements that it is the direct payer of the challenged fees who is the class member. And it wasn't just the one statement that I read by Mr. Shanmugam where the defendant said this. It was statement after statement after statement throughout the approval process. For example, at the final approval hearing, when asked, quote, who owns the claim, unquote, as between a supplier and a branded retailer, MasterCard's counsel stated that, quote, it's whoever directly pays the fee to the acquirer. That's what I believe the planned administration says fairly read. I think it's also true as a matter of federal antitrust law. It's the person that paid directly that has the claim, and that's from page 1212 of the joint appendix. And, you know, we cite other examples of this in our brief, example after example, where defendants said this, and class counsel said the same thing, and they specifically rejected the physical card handling test that I talked about, and they said that it's whoever pays, you know, the fee directly. It's who contracts with the acquiring bank, and that's the party that is the one that's purchasing the card acceptance services in the first instance. I mean, and that's the gas brand. The gas brand is the one that is the relevant participant in the market at issue here. It's the one that chooses whether to accept Visa cards or MasterCard cards to begin with, and it's the one that's directly bound by the network rules. The gas retailers here, they're only indirectly bound by those rules by virtue of the gas brands and telling them to follow those rules. And so it's really inconsistent with both this court's holding and FICE, the direct payer rule, and also with the settling party's expressed intent. So let me – I'm sorry, let me probe a little bit further into your argument. My understanding of Illinois BRIC, as I said before, and I think this is self-evident on the face of the opinion, is that it was addressing a situation in which you have a series, a series of transactions in which there's purchaser A who acquires whatever it is that was the subject of the antitrust violation, passes it, then sells it to purchaser B who in turn maybe sells it to purchaser C. And the Supreme Court said only purchaser A. Now what is your analysis that identifies the oil companies as purchaser A and the gas sellers as purchaser B in the manner that the Supreme Court was addressing in Illinois BRIC? Explain to me how that works. How are the gas companies the purchasers down the line from the gas companies, the oil companies, as purchaser A? So it's the gas brand that contracts with the acquiring bank and pays the fees directly to the acquiring bank. It's also the one that contracts up front. So chronologically there is a difference here. They're contracting up front for those services. And then they resell those services. That's what the contracts show. They resell them to the brand of gas retailers. Now granted, the services are not consumed until the cardholder swipes their card. So there may be a distinction between that and your kind of prototypical fact pattern that's from Illinois BRIC. But the reality is that Illinois BRIC is, you know, it's applied to this type of fact pattern a lot now, where we're talking about services that are being consumed rather than, you know, a physical good that's being resold at different points in time. So it's applied throughout, you know, for example, tech industry. So I think it would be a kind of radical departure from Illinois BRIC to say that, you know, you can't apply that framework to the services context. You know, for example, Microsoft sells cloud services, right? And they can sell those through a distributor. And the distributor then resells, essentially purchases capacity for this cloud computing service, right? And then the distributor resells those services to the ultimate retailer. And that's a common distribution mechanism that's used for a lot of types of services. And I think under Illinois BRIC and under Apple v. Pepper, too, which is a more recent Supreme Court, you know, precedent on Illinois BRIC, it's about who is directly contracting in the first instance from the ultimate, the first producer or seller of those services, right? So the fact that the services are not ultimately consumed until later, I don't think that really is relevant to the Illinois BRIC analysis. I do think it would be a pretty big departure, and it would upend a lot of Illinois BRIC law and the way it's been applied throughout many industries to hold that. So you're saying that the service stations purchase from the integrated oil company the right to use the Visa and MasterCard facilities? Correct. And the gas brand is also providing, you know, services there, too. The gas brand is providing some network services and is holding on to data, you know, associated with those card transactions for the branded retailer. So that is how the transaction works. And I did also want to address the kind of processor comment that Mr. Chamigan made, where he tried to, you know, explain his prior comment in saying that, well, the gas brand is essentially like a processor. The defendants have never argued that before, and that's inconsistent with how the parties have always treated gas brands. The class complaint had a gas brand as a class rep, CHS. So that shows, you know, class counsel, the class plaintiffs, intended to have gas brands be treated as direct payers and as class members, not just as a mere processor. And they did not, the class complaint defined processors in a special way, and it did not include, you know, gas brands under that definition. So the reality is that the settling parties, defendants and class counsel, have treated the acquiring bank and their processors as essentially interchangeable, so that, you know, when they said that it's a direct payment, the direct payer to the acquirer, they treated that as interchangeable with the direct payer or the processor. And processors are special, you know, types of entities that are often affiliated with the acquiring bank themselves, and they essentially just act as an agent for the acquiring bank, as reflected in the class complaint. And, in fact, several of the processors here are actually, they were defendants in the case, and they were excluded from the class definition. So, I mean, the idea that the, I think that that whole idea that the gas brands are processors is mistaken, and it's just a, you know, last-ditch argument that the defendants are making to try to square their clearly inconsistent representations. I have another question. This is not seeking a judgment in an antitrust case deciding whether the plaintiff wins. This is a settlement situation. It's a settlement between the defendants and the collectivity of the plaintiffs. But on this question of whether there can be more than one participant in a, in a, in the, what is paid by the violator to the plaintiffs, does it, is it, the district court adopted the view there can only be one, but supposing you went to the district, supposing you raised the possibility of a settlement between the gas companies and the service stations, is that, is it thought that the district court would entertain that, that if you settled it and said, we divide it 50-50 or on some other basis, the district court would say, no, there can only be one? I think the parties would be free to settle. You know, the actual class member could try to, you know, arrange it to some settlement with the, you know, the gas brand could try to arrange it to some settlement with the gas retailers to try to give them some recovery here. But was it thought that that was something eligible, something that you could do, that wouldn't run afoul of the district court's view that there can only be one? Well, it hasn't happened here. I mean, that's why we're here, you know, bringing our case. I know. The gas retailers are trying to get a recovery here. And they do believe, you know, we believe that we're indirect purchasers. Is this a situation where you don't want the recovery? We don't want the recovery from the settlement. We're not class members. And their problems with the settlement, as I talked about earlier, if you apply it to us, real adequate representation problems, because it means then that they settled based on the defense, this Illinois brick defense, that doesn't even apply to us. You know, so that is not adequate representation. And it also means then that the Brenna Gas retailers have to go through this claims process that's basically stacked against them. It wasn't designed for them in the first place. It was designed for the direct payer. It's based on the acquiring bank's data. Brenna Gas retailers don't contract with an acquiring bank for those cart processing transactions. Thank you, counsel. Thank you all. We'll take the case under advisement. That concludes our arguments for today. So I'll ask the Courtroom Deputy to adjourn. Court is adjourned. Thank you.